UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

MEDICAL CARD SYSTEM, INC. and
MCS LIFE INSURANCE COMPANY,

     Plaintiffs,

         v.

EQUIAN, LLC (FORMERLY KNOWN AS
HEALTH SYSTEMS INTERNATIONAL, LLC);
STAR HEALTHCARE NETWORK INC.; and
DAVITA HEALTHCARE PARTNERS INC.
(FORMERLY KNOWN AS DAVITA, INC.),

     Defendants.

CIVIL NO. 16-1228 (GAG)

## AMENDED COMPLAINT

Plaintiffs Medical Card System, Inc. (MCS) and MCS Life Insurance Company (MCS Life) (collectively, Plaintiffs or MCS) respectfully state as follows:

### NATURE OF THE ACTION

1.    This diversity action—for declaratory judgment, tort and contract claims—concerns two separate "contracts" signed by two so-called medical-fee negotiators (MFNs), purportedly acting as Plaintiffs' agents. Almost identical in their terms, both of these leonine contracts obligate MCS to (among other things) submit to arbitration. But MCS never authorized these MFNs to sign these contracts "on behalf of" MCS, or to otherwise bind it in such an onerous way.

2.    Co-defendant DaVita Healthcare Partners Inc., formerly known as DaVita, Inc. (DaVita) drafted the adhesion contracts, one of which was signed by co-defendant Equian, LLC (Equian) (formerly known as Health Systems International,

LLC (HSI))—and the other by co-defendant Star Healthcare Network Inc. (Star Healthcare). Affirming the consequent, DaVita initiated arbitration in Philadelphia, Pennsylvania—under the arbitration rules of the American Health Lawyers Association (AHLA)—to enforce the contracts signed by Equian and Star Healthcare.

3.      MCS seeks a judicial declaration that, because Star Healthcare and Equian lacked authorization to execute such contracts, the DaVita Single Patient Agreements (SPAs) signed "on behalf of MCS" are null *ab initio*, (because the SPAs lack the necessary consent or have an illegal consideration (*causa*)). MCS also seeks damages against Equian, Star Healthcare, and DaVita for their unauthorized execution of the SPAs and for contracting in prejudice of Plaintiffs.

PARTIES

4.      MCS is a corporation with principal place of business in San Juan, Puerto Rico, organized and existing under the laws of the Commonwealth of Puerto Rico, which provides administration services to health and life insurance companies. MCS does not offer private health plans or health insurance products. It is the parent company of a health insurance company and two health services organizations in Puerto Rico, and provides administrative and support services to these.

5.      MCS Life is also a corporation with principal place of business in San Juan, Puerto Rico, organized and existing under the laws of the Commonwealth of Puerto Rico. A subsidiary of MCS, MCS Life is licensed by the Commissioner of

Insurance of Puerto Rico to provide a commercial line of health insurance products to the public.

6.      Equian is a limited liability company organized and existing under the laws of Indiana, with principal place of business in Indianapolis, Indiana. It describes itself in its corporate webpage by the following statement: "We provide solutions that ensure each healthcare interaction is paid accurately and at the lowest possible cost. We have a proven system to reduce healthcare cost through proprietary data analytics coupled with deep domain expertise. Once we have aligned with you and analyzed all of the data, we provide integrated payment integrity solutions that eliminate unnecessary spending."

7.      Star Healthcare is a company incorporated under the laws of the State of New York, with principal place of business in New York, New York. It describes itself in its corporate webpage by the following statement: "Star Healthcare Network, Inc. is an international Preferred Provider Organization (PPO). Star has strategically contracted with providers worldwide to offer clients a comprehensive list of services – along with excellent discounts. Headquartered in New York City, Star's PPO network consists of 4,000 hospitals, 400,000 physicians worldwide. Our network relationships extend to ancillary providers, such as labs, outpatient centers, dialysis centers and other varied services."

8.      DaVita is a company incorporated in the State of Delaware with principal place of business in Denver, Colorado. It describes itself in its corporate webpage by the following statement: "DaVita HealthCare Partners Inc., [is] a

3

Fortune 500® company that, through its operating divisions, provides a variety of health care services to patient populations throughout the United States and abroad."

<strong>JURISDICTION</strong>

9.     This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1332, because the amount in controversy, exclusive of interests and costs, exceeds $75,000, and this dispute is between citizens of different states. This Court may grant declaratory and related relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202, because there exists an actual and justifiable controversy between Plaintiffs, Equian, Star Healthcare, and DaVita.

10.     Venue is proper in this District, as MCS Life and Equian have agreed that any dispute related to their business relationship must be "exclusively brought in [the] US District Court for the District of Puerto Rico located in San Juan, Puerto Rico." Equian has a business relationship with Plaintiffs, and its actions or omissions and its signing of the SPA have caused them damages.

11.     Venue in this District is proper as to Star Healthcare pursuant to 28 USC §1391(b)(2), since Puerto Rico is one of the judicial districts in which a substantial part of the events or omissions giving rise to the claim occurred. Star Healthcare has a business relationship with Plaintiffs, and its actions or omissions and its signing of the SPA has caused Plaintiffs' damages.

12.     Venue is proper as to DaVita, whose alleged subsidiary currently operates in Puerto Rico, because Puerto Rico is the site of Plaintiffs' alleged breach

of the SPAs, also being the District where the alleged "risk" would be based. Venue is also proper as to DaVita, because, signing the SPAs, DaVita entered into "contracts in the prejudice of a third person," harming MCS, a third party—which had not authorized the entering of the SPA on its behalf and which has suffered damages by its unlawful execution—and thus risking being sued in MCS's principal place of business.

**GENERAL ALLEGATIONS**

13.    DaVita is demanding a hefty sum from MCS—in excess of $700,000 under both SPAs for dialysis services, among other types of services (including vaccinations) provided to two patients (whom we will identify as Patients "SK" and "JST" for purposes of confidentiality). These patients are beneficiaries (subject to conditions, exclusions and limitations) under two different MCS Life health insurance policies issued in Puerto Rico, approved by the Commissioner of Insurance of the Commonwealth of Puerto Rico, and governed by Puerto Rico law.

14.    The services provided were voluntarily offered in other jurisdictions by Temple Terrace Dialysis and Long Beach Harbor UCLA. DaVita claims to be indirectly related to these entities and purports to have authorization to negotiate and arbitrate on their behalf.

15.    The SPAs, if valid, in effect would turn MCS from being an insurer of Patients SK and JST to being an unlimited guarantor of all the services provided by DaVita during the term of each SPA.

16.     The SPAs state that the "terms of this Agreement, including attachments, exhibits, schedules and amendments, supersede and take precedence over all other payment arrangements or agreements with respect to this Patient," in effect altering—to MCS Life's prejudice—the terms, conditions and limitations of the health insurance policies in question. The SPAs also state that DaVita will not need further verification of eligibility, or securing additional referrals or authorizations.

17.     In spite of the specified coverage terms stated in the policies, the SPAs that Star Healthcare and Equian signed indicate that "both parties agree that, regardless of any policy or plan benefit level of Patient, Payor shall be responsible for payment for all Provider Covered Services rendered in accordance with the Covered Services Fee Schedule, with the exception of co-payments, deductibles or coinsurance regardless of any agreement Payor may have with any other payor, employer or third party to provide payment."

18.     The SPAs also submit any controversy to arbitration before the AHLA Arbitration Tribunal in Philadelphia, Pennsylvania.

**The Relationship between MCS and the MFNs**

19.     MCS Life uses MFNs to access Preferred Provider Organizations (PPOs), which such MFNs have formed and maintain outside the Commonwealth of Puerto Rico (where MCS maintains its own local PPO network).

20.     In Patient SK's case, the SPA was executed, on the one hand, by Nilsa Flores, an employee of Star Healthcare, and on the other, by an employee of DaVita

named Merlie Carver. For Patient JST, the SPA was executed by Ramón González, an employee of HSI, and (as in the other SPA) by Merlie Carver for DaVita.

21.    The execution of said SPAs, however, falls outside the services specifically contracted with these MFNs, the scope of the services regularly performed by them, and the services provided by these MFNs in the normal and ordinary course of business.

## SERVICES SPECIFICALLY CONTRACTED BY MCS WITH THE MFNS

22.    The common denominator of the contractual relationship between Plaintiffs and Equian/Star Healthcare is that the scope of their agreements is or was to allow MCS Life to have access to the organizations' PPOs.

23.    Following that common denominator, the scope of the agreement between MCS Life and Star Healthcare was for it to give MCS Life access to Star Healthcare's PPO.

24.    In turn, MCS Life would use its best efforts to establish and implement tangible steering mechanisms designed to direct covered persons—namely its insured individuals—to Star Healthcare PPO's providers. Such mechanisms would or could include a plan design or a comparable financial incentive or disincentives program, and could include distribution of health insurance identification cards.

25.    Equian's agreement with MCS follows similar parameters: Equian (then called HSI) would provide MCS Life with network access to its PPO's contractual discounts as well as negotiated discounts for all out-of-network medical bills.

26.     In both cases, MCS agreed with its MFNs that it would make direct payment to the network providers, consistent with the services covered under the health insurance policies.

27.     The contracts between MCS and its MFNs never contained any clause or language that authorizes the MFNs to execute arbitration agreements, much less to obligate MCS beyond the terms and conditions of its insurance policies.

### SERVICES REGULARLY PERFORMED BY MFNS FOR MCS

28.     Equian and Star Healthcare's usual scope of business is limited. Their role simply and merely is to obtain network participation through price negotiations. It is not their role to modify the extent of the obligation of the insurer or to modify the terms of a policy, much less, for example, the meaning of a material term such as "covered services." Nor do they have the faculty of transforming MCS from being an insurer into being a guarantor.

29.     The services regularly performed by MFNs for MCS Life usually took one of two forms.

30.     In the first one, an out-of-network medical provider who provided services to an MCS insured would submit a medical bill to MCS Life, and MCS Life would then request its MFN to negotiate a discount for payment. Once set on a sum that the negotiator felt comfortable to recommend to MCS Life, the MFN would then seek MCS Life's approval and, if accepted by MCS Life, an agreement for payment was reached.

31.    The other form is the use of the MFN's PPO network under already negotiated network discounts. In the case of non-network providers, MCS would refer the provider to the MFN so it would incorporate it to its network for any and all future patients or for a single patient.

32.    MCS participates in the negotiations and execution of its letters of agreement with service providers including service providers outside the Commonwealth of Puerto Rico.

33.    MFNs are not authorized to provide coverage under MCS policies if there is no coverage, nor are they otherwise authorized to provide benefits to MCS beneficiaries, or agree to pay providers beyond the terms and conditions of the policy, much less to make MCS a guarantor of any medical services that a provider dispenses to MCS health insurance policy beneficiaries.

34.    With the understanding that it would be paying only for the fees and services specifically authorized of the MFN networks, and under the terms of its policies and of the coverage limitations thereunder, MCS in fact did pay DaVita for medical services at the rates that the MFNs informed MCS, all of which occurred without the MFNs ever informing that they had entered into any additional agreements beyond their having obtained a medical fee discount.

### THE UNAUTHORIZED SPA SIGNED AS TO PATIENT SK

35.    In late May of 2011, Patient SK suffered acute renal failure and required dialysis. While she lived in the mainland, her policy covered only services

to be received in Puerto Rico. Her case for dialysis in California was referred to Star Healthcare as MCS's "International PPO."

36.   On June 3, 2011, Star Healthcare issued an ID card for Patient SK to have access to its PPO.

37.   On June 7, 2011, MCS. Life wrote to Patient SK indicating that coverage for dialysis was limited and was given authorization for hemodialysis services at the Long Beach Harbor UCLA Dialysis Center.

38.   Likewise, on the same date, MCS Life sent a similar letter to Long Beach Harbor UCLA Dialysis Center (copy of which was also sent to Star Healthcare), indicating that Patient SK was authorized to have dialysis treatment three times per week from June 7, 2011 to September 5, 2011.

39.   The letter to Long Beach Harbor UCLA Dialysis Center indicated that the services (from June 7, 2011 to September 5, 2011) would be covered "according to case management review, medical necessity and insured coverage; under Star HealthCare Network, fees. Any other services must be pre-authorized by our Case Management Program prior to treatment. This requires the submission of the evaluation report, progress notes and any future recommendations."

40.   A number of invoices were billed by Star Healthcare to MCS Life and paid to DaVita under MCS Life's assumption that this was the extent of the contractual relationship among the parties.

41.   The Star Healthcare Explanation of Benefits provided was consistent with the usual and normal way of doing business between MCS and Star

10

Healthcare and provided the total amount due to the provider as well as the total amount of the access fees due to Star Healthcare. It indicated that the PPO Benefits applied. MCS Life was never informed of the existence of an SPA signed "on behalf of" MCS.

42.     Unbeknownst to Plaintiffs, DaVita, who had full knowledge of the limited coverage of the health insurance policy, and without exercising the least minimal modicum of due diligence to confirm the consent of MCS Life and of Star Healthcare's authorization to bind MCS Life, intentionally procured by hook or by crook the execution of the one-sided, leonine, adhesion SPA it now wishes to enforce against MCS.

43.     In early 2013, MCS received a series of invoices which, in and of themselves, resulted in financial accounting transactions and balance investigations by MCS.

44.     A company called Total Renal Care, Inc., which at the time was registered to do business in Puerto Rico, acting as DaVita's d/b/a, agent, or alter ego sent several refund checks to MCS, because audits had revealed "overpayments."

45.     DaVita's accounting had also failed to cash checks that had been issued to it, so new checks had to be issued.

46.     Notably, and contrary to the usual, ordinary and proper medical claims practice, it was not until after DaVita commenced communicating with MCS through counsel, that it included for payment invoices which had never been

submitted to MCS, which related to services purportedly provided over a year prior to MCS ever seeing such invoices for the first time.

#### THE UNAUTHORIZED SPA SIGNED AS TO PATIENT JST

47.     In November 2013, Patient JST was taken to a hospital and required dialysis. After he was sent to an in-patient specialized nursing facility, where he also received dialysis, he was discharged and apparently started receiving outpatient services at Temple Terrace Dialysis in Tampa, Florida.

48.     MCS Life did not receive prior notice of Temple Terrace's involvement in Patient JST's treatment.

49.     Sometime before April 7, 2014, DaVita contacts then HSI—but not MCS Life, or its PPO at the time—regarding a *finite* number of invoices for dialysis services provided to patient JST. In turn, HSI [Equian] contacted MCS and to procure payment of *those invoices*, and to offer its services to negotiate a discount as to *those particular invoices*.

50.     HSI [Equian] was informed that it could negotiate such a discount for *those particular invoices*. Equian, however, was neither told nor otherwise authorized to enter into any other arrangement or agreement for future services.

51.     In fact, these invoices were "processed" by HSI [Equian] and forwarded to MCS with the corresponding Settlement Notice and Invoice indicating that the bill had been "Successfully Negotiated," the allowable payment due, the alleged amount saved, and the fee due to HSI [Equian].

52.     At no moment did HSI [Equian] inform, forward, or show Plaintiffs the existence of any SPA, or that Equian had executed an SPA "on its behalf." The terms of the Settlement Notices under which MCS Life made payments are different from the terms of the SPA.

53.     Unbeknownst to Plaintiffs, DaVita, who had prior knowledge of MCS's policies as a result of its experience with Patient SK, approached HSI [Equian] and again, without exercising a modicum of due diligence to confirm its authorization, again procured the execution of the one-sided, leonine, adhesion SPA it now wishes to enforce against MCS.

54.     Equian, without authorization, and knowing of the obvious prejudice that would be inflicted upon MCS, signed the SPA.

55.     It is not until 2015 that, for the first time—and again, contrary to the usual, ordinary, and proper medical-claims practice—counsel for DaVita included invoices throughout different stages of DaVita's communications with MCS about services allegedly performed to Patient JST that had never been submitted to MCS. These related to services that were allegedly provided over a year earlier.

56.     DaVita claimed that the delay in MCS receiving such invoices was attributable to Star Healthcare and to Equian.

SUMMARY

57.     DaVita's "standard form" SPA is an adhesion contract that nullifies health insurance policies.

58.     DaVita regularly provides services to beneficiaries of health insurance policies. DaVita knows that in health insurance policies there are limits, exclusions to insurance coverage, co-insurance, and other policy terms.

59.     MCS is an insurance company, not a guarantor of medical debts.

60.     In spite of its prior knowledge, and in reckless disregard to the limits of MCS's policies, in an effort to unjustly enrich itself, DaVita provided and insisted in a leonine adhesion contract for execution to an entity that did not have MCS's authorization to bind it in such terms, in bad faith, and without exercising the most elemental due diligence necessary to ascertain that the MFNs had the necessary authorization to sign and obligate MCS to overextended coverage obligations and to arbitration in case of a dispute as to such.

61.     Neither Star Healthcare nor HSI [Equian] had authority to go beyond the terms of the policies. Nor did they have authorization to obligate MCS to arbitration or the terms of the SPAs.

### COUNT I (DECLARATORY JUDGMENT AND NULLITY OF THE SPAS)

62.     Plaintiffs hereby incorporate the allegations set forth above, all of which are fully re-alleged here.

63.     The defendants executed the SPAs without the knowledge, approval, or consent of MCS.

64.     MCS is entitled to declaratory judgment that because Equian and Star Healthcare were neither explicitly nor implicitly authorized to sign the SPAs with

DaVita "on behalf of MCS," the SPAs lack consent and are thus inexistent or null *ab initio*.

65.     Insofar as the SPAs had an illegal consideration—because they were meant to harm Plaintiffs—Plaintiffs are also entitled to a declaration of their absolute nullity.

COUNT II ("CONTRACTS IN THE PREJUDICE OF A THIRD PERSON")

66.     Plaintiffs hereby incorporate the allegations set forth above, all of which are fully re-alleged here.

67.     DaVita, Star Healthcare, and Equian executed the SPAs with full knowledge that they would turn MCS from an insurer in to a guarantor, thus exposing MCS to financial harm.

68.     Knowing, as any reasonable person should know, that the relationship between an insurer (MCS Life) and its insureds is limited by the terms and conditions an insurance policy, DaVita signed an SPA with both Equian and Star Healthcare.

69.     The SPAs economically benefitted DaVita—because, among other things, it would receive dramatically higher reimbursement rates than it otherwise would have received from Medicaid and Medicare—Equian, and Star Healthcare at MCS's expense.

70.     By insisting in the SPA's execution, DaVita entered into "contracts in the prejudice of a third person," thereby harming MCS, a third party that never authorized the signing of any such contract on its behalf.

71.    MCS has suffered damages because of the SPAs' unlawful execution.

72.    Insofar as the SPAs had an illegal consideration, Plaintiffs are entitled to seek their absolute nullity.

73.    The defendants, either collectively or individually, contracted in Plaintiffs' prejudice.

### COUNT III (BREACH OF CONTRACT AND COVENANT OF GOOD FAITH)

74.    Plaintiffs hereby incorporate the allegations set forth above, all of which are fully re-alleged here.

75.    Equian's and Star Healthcare's contractual relationships with Plaintiffs obligated them to comply with MCS's relevant insurance policies and to conduct themselves in good faith.

76.    By signing the SPAs, which exceeded the scope of their contractual relationships with Plaintiffs, both Equian and Star Healthcare violated their contracts with Plaintiffs.

77.    By signing the SPAs, and thus knowingly harming Plaintiffs, Star Healthcare and Equian acted in bad faith and thus violated their implied contractual obligations to act in good faith.

78.    Because Star Healthcare and Equian knew, or should have known, that signing the SPAs would breach their contracts with Plaintiffs, they incurred in *dolo*.

79.    Star Healthcare and Equian are thus liable for all damages Plaintiffs have suffered as a result of their bad faith and dolo-type performance of their contracts with Plaintiffs.

### COUNT IV (TORTIOUS INTERFERENCE WITH CONTRACTS)

80.    Plaintiffs hereby incorporate the allegations set forth above, all of which are fully re-alleged here.

81.    DaVita's conduct constitutes tortious interference with contractual relationships.

82.    DaVita also intentionally interfered with Plaintiffs' commercial relationships with Plaintiffs' beneficiaries, Star Healthcare, and Equian.

83.    DaVita, consciously and with utter disregard to the relationships between MCS and its beneficiaries, and between MCS Equian and Star Healthcare—which are limited by the terms and conditions of insurance policies—coaxed the other defendants into signing the SPAs, thus intentionally causing Equian and Star Healthcare to breach their contracts with Plaintiffs.

84.    The breaches DaVita caused have resulted in significant damages to Plaintiffs in the form of unnecessary payments and having been involuntarily hauled into arbitration.

### COUNT V (CONTINGENT DAMAGES)

85.    Plaintiffs hereby incorporate the allegations set forth above, all of which are fully re-alleged here.

86.     MCS presents this contingent cause of action for not less than $500,000 against Equian and not less than $200,000 against Star Healthcare because of the signing of the SPAs, and their actions or omissions in their performance of their services, and for the actions or omissions of their employees.

87.     These sums would be the possible award that MCS may be liable to DaVita because of Equian's and Star Healthcare's signing of the SPAs, or if no such liability is found, for the costs and expenses (including attorneys' fees) incurred by MCS in defending itself from being found to be bound to DaVita under the SPAs.

PRAYER FOR RELIEF

88.     WHEREFORE, Plaintiffs pray for judgment as follows:

89.     On the first cause of action, declare that the SPAs are null *ab initio*, since the necessary consent was not present, or because the "causa" was illegal, and that MCS shall restore to DaVita any amounts plus interest of any discounted fees after the proper accounting; the MFNs must also return the fees they received in light of their agreements for the alleged discounts they obtained;

90.     On the second cause of action, for joint and several liability, relief in the form of damages in an amount to be determined at trial, plus interest, attorneys' fees, and costs;

91.     On the third cause of action, for joint and several liability, relief in the form of damages in an amount to be determined at trial, plus interest, attorneys' fees, and costs;

92.     On the fourth cause of action, relief in the form of damages in an amount to be determined at trial, plus interest, attorneys' fees, and costs;

93.     On the fifth cause of action, for joint and several liability, relief in the form of damages in an amount to be determined at trial (but no less than $700,000) plus interest, attorneys' fees, and costs;

94.     Reasonable attorneys' fees and expenses or costs of suit, including expert witness; and

95.     For all other relief to which Plaintiffs are justly entitled.


Dated: July 13, 2016                           Respectfully submitted,


DEL TORO & SANTANA
*Attorneys for Medical Card System, Inc.*
*and MCS Life Insurance Company*

Plaza 273, Suite 900
273 Ponce de León Ave.
San Juan, Puerto Rico 00917-1934
Tel. (787) 754-8700
Fax (787) 756-6677

**/S/ ROBERTO SANTANA-APARICIO**
USDC-PR 122811
rsantana@dtslaw.com

**/S/ ARTURO V. BAUERMEISTER**
USDC-PR 302604
abauermeister@dtslaw.com

## CERTIFICATE OF SERVICE

I certify that, on this day, the foregoing was electronically filed with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

By: **/s/ Arturo V. Bauermeister**